*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-520

EVERICK NEWMAN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-19910-16)

(Hon. Kimberly Knowles, Trial Judge)

(Submitted May 30, 2018                    Decided September 2, 2021)

*Christine Pembroke* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Bridget Behling*, and *L'Shaunteé J. Robertson*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and NEBEKER,[*] *Senior Judge*.

Per curiam opinion on page 2.

Separate statement by *Associate Judge* EASTERLY concurring in the judgment on page 8.

---

[*] Judge Nebeker was assigned to this case after Judge Farrell retired.

Concurring opinion by *Senior Judge* NEBEKER on page 8.

PER CURIAM: Everick Newman appeals his convictions for unlawful possession of a firearm,[1] related gun charges,[2] and unlawful possession of a controlled substance[3] following a stipulated bench trial. He argues that the trial court erred in concluding the police had the requisite reasonable, articulable suspicion to conduct a *Terry*[4] stop.[5] He also raises a Second Amendment

---

[1] D.C. Code § 22-4503(a)(1) (2021 Supp.).

[2] Carrying a pistol without a license, D.C. Code § 22-4504(a)(2) (2021 Supp.), Possession of an unregistered firearm, D.C. Code § 7-2502.01(a) (2018 Repl.), and Unlawful possession of ammunition, D.C. Code § 7-2506.01(3) (2018 Repl.).

[3] Mr. Newman was found guilty of one count of possessing phencyclidine (PCP), in violation of D.C. Code § 48-904.01(d)(2) (2014 Repl.), and one count of possessing alprazolam (Xanax), in violation of D.C. Code § 48-904.01(d)(1) (2014 Repl.).

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

[5] At our direction in supplemental briefing, Mr. Newman also challenges (1) whether the police had sufficient basis to conduct a protective pat down for weapons, and (2) whether the pat down performed by the police exceeded the bounds authorized by *Terry*, 392 U.S. at 30.

As to the first issue, Mr. Newman argues the police did not have a reasonable belief that he was armed and dangerous to justify a protective pat down because Mr. Newman's clutching of his waistband was "at most . . . ambiguous." But as detailed below, the police observed Mr. Newman clutching his waistband while running away at "full speed," in an area known for drugs and gun violence.

(continued…)

challenge to his gun convictions based on the D.C. Circuit's decision in *Wrenn v. United States*, 864 F.3d 650 (D.C. Cir. 2017).  The judgment is affirmed.

## I.

Turning first to Mr. Newman's challenge to the trial court's suppression ruling, we reaffirm that we review de novo all legal rulings on Fourth Amendment issues, but we review only for clear error the trial court's factual findings, and we examine the full record in the light most favorable to the government as the prevailing party.  *See (Anthony) Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019).  The trial court's decision to deny Mr. Newman's motion to suppress was based largely on the credited testimony of one of the arresting officers, Officer Moshier, that (1) Mr. Newman ran away from him and his partner, Officer Cory, at "full speed," when they responded to an unrelated report of disorderly conduct at an apartment building in a southeast Washington neighborhood where the police were called out to frequently, (2) Mr. Newman held the waistband of his pants with

---

(…continued)
The cases cited by Mr. Newman — which involve defendants engaging in ambiguous furtive gestures but not fleeing from police — are inapposite.  As to the second issue, we are persuaded by the government's argument that Mr. Newman waived his challenge to the scope of the officers' pat down by failing to raise it in the trial court.  *See* D.C. Code § 23-104(a)(2); *see also Artis v. United States*, 802 A.2d 959, 965 & n. 5 (D.C. 2002).

his right hand as he ran, while his left arm swung freely, (3) when the police went to look for him after they responded to their call, he again ran away from them at "full speed," securing his waistband with his right hand, and (4) when the police caught sight of Mr. Newman again, he ran away a third time and then finally "gave up" and stopped, allowing Officer Moshier to seize him. The trial court concluded that this evidence gave the police a lawful basis to conduct a *Terry* stop and frisk.

Mr. Newman argues that "[i]n this case, . . . where the officer was responding [only] to flight and furtive gestures," it was error for the trial court to conclude that the police had reasonable articulable suspicion that Mr. Newman was engaged in criminal activity. Mr. Newman begins his analysis by highlighting the fact that the police had no reason to suspect him of criminal activity when they saw him. But as the record established, soon after the police encountered Mr. Newman, he ran away from them while clutching his waistband with one hand, in a manner that made Officer Moshier think Mr. Newman had "some sort of illegal contraband," in a neighborhood Officer Moshier testified "[wa]s known for a lot of gun violence and drugs."

Regarding the trial court's consideration of his flight, Mr. Newman does not appear to take issue with the relevance of flight generally in the reasonable

suspicion analysis, although he fails to cite the Supreme Court's decision in *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (recognizing that unprovoked flight is pertinent to the *Terry* calculus). Instead, he argues that *his* initial flight from the police would not have been suspicious to a reasonable police officer because "[t]here are numerous innocent explanations" for it. While that may be so, here the evidence established that Mr. Newman fled from the police while clutching his waistband not just once but three times, a fact that Mr. Newman glosses over in his analysis.[6] In these circumstances the trial court did not err in concluding that his repeated flight while holding the side of his pants substantially contributed to a determination of reasonable articulable suspicion. *See Wilson v. United States*, 802 A.2d 367, 368, 370–71 (D.C. 2002) (holding police had reasonable articulable suspicion to stop appellant and his companion who "quickened their pace" upon seeing officers, "hurried down [a] hallway," and then "frantically pounded on an apartment door"); *Pridgen v. United States*, 134 A. 3d 297, 303 (D.C. 2016) (declining to rely on appellant's initial flight from the police who shouted at him from an unmarked car late at night, and focusing instead on "what appellant did as

---

[6] Mr. Newman instead highlights his testimony that he initially fled from the police after Officer Cory, Officer Moshier's partner, ordered him to stop. But the government did not concede Officer Cory had given such a directive. Officer Moshier testified only that he heard his partner say "something" to Mr. Newman; he "wasn't quite sure what." And the trial court never made a finding crediting Mr. Newman's testimony on this point.

he ran"— including "holding his side" — "and what he did after he entered the apartment building" in concluding officers had reasonable articulable suspicion that appellant was armed).

Lastly, Mr. Newman challenges the trial court's reliance on the testimony that he was clutching at his waistband with one hand as he ran from the police. Citing factually distinguishable cases, he argues that his placement of his hand at his waistband could have had an innocent explanation. Again we do not disagree, but a reasonable officer nonetheless could have concluded (as Officer Moshier did conclude) that Mr. Newman's act of clutching his waistband while running signaled the possession of illegal contraband. *See Pridgen*, 134 A.3d at 303–04 (agreeing with the trial court that "a critical fact in evaluating whether the officers had a basis for reasonable articulable suspicion was that, during the entire time appellant was running, he held his hand against his left side" in a way that led the police to believe he was armed (internal quotation marks omitted)); *see also id.* at 304 n.20 ("[T]he officers' reasonable suspicion of a gun did not depend on their being able to eliminate every conceivable innocent explanation for appellant's posture while running."). For these reasons, we reject Mr. Newman's challenge to the trial court's ruling denying his motion to suppress on Fourth Amendment grounds.

## II.

Mr. Newman also argues that his convictions for CPWL and unlawful possession of ammunition must be vacated "[i]n the wake of [the District of Columbia Circuit's decision in] *Wrenn v. District of Columbia*," 864 F.3d 650 (D.C. Cir. 2017). Mr. Newman appears to understand *Wrenn* as a decision that generally invalidated on Second Amendment grounds all gun control legislation in the District of Columbia that precludes an individual from "carry[ing] a pistol in public for self-defense." As we explained, however, in *(Reginald) Hooks v. United States*, 191 A.3d 1141 (D.C. 2018), the holding of *Wrenn* is much more limited: "[*Wrenn*] did not invalidate the CPWL statute, but merely what it called the District's 'good reason' law," by which it referred to a set of statutes and regulations limiting the basis upon which an individual could be issued a license to carry a weapon. *Id.* at 1145. "Any statutory law not encompassed by *Wrenn's* definition of 'good-reason law' remains undisturbed"; this includes the statutory requirements that "a person must be 'suitable' to qualify for a concealed carry license," *id.* at 1145–46 (quoting D.C. Code § 22-4506), and "must 'meet all of the requirements for registering a firearm,'" *id.* (quoting 24 D.C.M.R. § 2335.1(a)(2015)) (brackets and ellipsis omitted). Mr. Newman does not dispute

that he had a prior felony conviction that would have made him ineligible to obtain a concealed carry license, *see id.* at 1146 & n.5, or that the firearm the police recovered from his person when they arrested him was not registered. Accordingly, his Second Amendment challenge to his CPWL and ammunition possession convictions based on *Wrenn* is rejected, and the judgment of the Superior Court is affirmed. It is so ordered.

EASTERLY, *Associate Judge*: I concur in the judgment.

NEBEKER, *Senior Judge*, concurring: "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145 (1972). Instead, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may

be most reasonable in light of the facts known to the officer at the time." *Id*. at 146.

To justify such a stop requires reasonable articulable suspicion; in other words, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. We "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (cleaned up). "Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also Jones v. United States*, 154 A.3d 591, 595 (D.C. 2017) (explaining that our analysis is "earthy and realistic" (cleaned up)).

Deferring to the factual findings and assessing *de novo* whether those findings added up to reasonable articulable suspicion under the totality of the circumstances, the court correctly holds that they did. Our court has identified, in addition to spatial and temporal proximity,

> a number of ... important factors to consider when looking at the totality of the circumstances: the number of people about in the area, multiple other stops, the time of day, flight, the high crime nature of the location, furtive hand movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and the viewing of an object or bulge indicating a weapon.

*Armstrong v. United States*, 164 A.3d 102, 110 (D.C. 2017) (cleaned up).

First, appellant was seen leaving the building from which came the disorderly conduct call to which the officers were responding. *See Armstrong*, 164 A.3d at 110. Second, appellant's response to Officer Cory's questioning was to raise his hands and flee. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). Third, while fleeing, appellant grabbed at his side – a gesture consistent with concealment of a weapon. *See Green v. United States*, 974 A.2d 248, 256 (D.C. 2009) (holding reasonable suspicion where, among other factors, the appellant made a "furtive gesture or a gesture of concealment . . . to his waistband (where those engaged in criminal activity are known to hide a gun)"). Fourth, appellant took flight and grabbed his side again when Officer Moshier encountered him a second and third time. Fifth, before their third encounter, the officer observed appellant peeking around a corner. *See* Merriam-Webster, "peek" (defining peek

as "to look furtively"); *Sibron v. New York*, 392 U.S. 40, 66 (1968) (explaining that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea"). Sixth, all of this took place in a high-crime neighborhood, or as the court euphemistically described it, "not a police friendly area." *See Wardlow*, 528 U.S. at 124 (weighing "that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis").

Appellant asks us to view each observation in a vacuum and hold that Officer Moshier lacked reasonable suspicion because individual observations devoid of context may have innocent explanations. However, our standard of review tasks us to contemplate the totality of the circumstances. *See Arvizu*, 534 U.S. at 273. Viewing the evidence in the light most favorable to the prevailing party, maintaining an "earthy and realistic" analysis, *Jones*, 154 A.3d at 595, and "allow[ing] officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available," *Arvizu*, 543 U.S. at 266, require the court to hold that Officer Moshier had reasonable articulable suspicion to stop appellant.

Appellant would have the court look at the record through his eyes. Frankly put, appellant's perspective is irrelevant to the constitutional Fourth Amendment

framework handed down to us by the Supreme Court. "[T]he evidence . . . must be seen . . . as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418. In other words, we must view the evidence "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Peay v. United States*, 597 A.2d 1318, 1322 (D.C. 1991) (en banc) (cleaned up) (citing *Cortez*, 449 U.S. at 418).

Whether one may imagine innocent rationales for appellant's behavior, such as a distaste for police officers, is of no moment when considering the totality of the circumstances known to the police officers at the time of the stop. Nor is it material to the court's analysis that appellant felt "blitzed." Limiting our view of the evidence to that which is mandated by the Supreme Court's Fourth Amendment jurisprudence, the court must conclude that Officer Moshier's actions were reasonable in light of his observations and in due deference to his experience and training.

Though the officers' frisk was thorough, it was less than a full search and was justified by the observation that at times appellant's hand grabbed his waistline and lower. That a pat down must be limited to that which is necessary to discover weapons does not serve to limit what part of the suspect's person is

frisked; rather, it serves to limit what types of contraband officers may frisk for. *See Adams*, 407 U.S. at 146 ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable . . . ."). Indeed, the *Terry* Court gave the following "apt" description of a frisk: "The officer must feel with sensitive fingers every portion of the [suspect's] body. A thorough search must be made of the [suspect's] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." 392 U.S. at 18 n.13 (cleaned up).

While the officers patted down appellant's groin area and, upon detecting a hard object, reached into his underwear to retrieve a gun, this was necessary based on the observation that appellant was holding his waist area and lower while fleeing and was limited to discovering weapons. The *Terry* Court did not have before it the question of a weapon hidden beneath multiple layers of clothing; however, Officer Moshier's safety concerns based on these observations justified a pat down of each layer of clothing, even if this required moving top layers. *See Adams*, 407 U.S. at 147-48 (holding that officer was justified when he reached into suspect's waistband based on informant's tip that suspect was storing a gun in his waistband). To hold that the officers exceeded the scope of a permitted *Terry* frisk

in this case just because they patted down the area where appellant sought to conceal a weapon would be to deny them the "necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id*. at 24. Furthermore, the fact that the officers, upon finding objects that were not a weapon, replaced those items indicates that his search was indeed limited to discovering weapons. The officer's search did not exceed the scope of a limited pat down for weapons.

## Conclusion

Because Officer Moshier had reasonable articulable suspicion that appellant was armed, the officers were justified in stopping him and conducting the pat down as they did. I therefore concur in affirming the hearing court's decision to deny appellant's motion to suppress.